UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 16cr265 (LMB) |
| ) | |
| NICHOLAS YOUNG, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT NICHOLAS YOUNG'S REPLY IN SUPPORT OF MOTION TO SUPPRESS ITEMS UNCONSTITUTIONALLY SEIZED FROM HIS RESIDENCE, BACKPACK, PICKUP TRUCK, AND LOCKER**

Defendant Nicholas Young has moved to suppress items seized in August 2016 from his residence, backpack, pickup truck and locker pursuant to warrants authorizing the seizure of, among other things, all firearms in his possession and all his electronic devices. ECF 69. He has also moved to suppress irrelevant and unduly prejudicial objects seized outside the scope of the warrants which the government has expressly committed to using at trial in conversation with undersigned counsel. *Id.* All these searches and seizures were conducted in the name of finding evidence of the nonviolent gift-card crime the government alleges it induced Mr. Young to commit in culmination of its over-five-year undercover terrorism investigation. *Id.* In reality, the seized objects would be used at trial not to prove the gift-card crime but to inflame and distract the jury.

In opposition, the government filed a brief approximately one minute shy of 12:00 am on March 4, 2017 – four days past the deadline fixed by the local rules. ECF 75. The government has provided no explanation for the delay, much less the "excusable neglect" required by Fed. R. Crim. P. 45(b)(1)(B). Accordingly, the opposition should be stricken or disregarded.

1

The opposition rests on four arguments. First, the government contends the August 2016 searches and seizures were not conducted solely to collect superfluous evidence of the gift card crime induced by the government itself. It points to gauzy representations in the warrant applications citing Mr. Young's alleged "contacts with terrorist groups in the past" and "attempts to travel overseas to fight on behalf of terrorist groups." ECF 75, p. 12 (citing ECF 69-4 at ¶ 18). Here the Court should keep its eye closely on the cards moving around the table. Occasionally, "terrorist groups," plural, becomes a single "militia group," one that "possibl[y]" has a "link" to al-Qaeda, but which is not itself a designated Foreign Terrorist Organization (FTO). ECF 75, p. 9. This argument fails because "possible links" is as good as "possible-probable cause" – *i.e.*, no probable cause at all. Moreover, because Mr. Young has never had any "terrorist links," and since the government relies on these affidavit representations to establish probable cause to support the seizures, it is now clear the Court should hold a hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), in which the government will provide the alleged factual predicate for its representations to this Court (including Magistrate Judges Buchanan and Anderson) that Mr. Young actually aided or fought on behalf of a real world FTO (as opposed to the U.S. government posing as one).

Second, the government argues the warrants properly authorized seizure of all Mr. Young's firearms and related objects on the strength of cherry-picked violent speech allegedly uttered half a decade before the warrant applications were filed. ECF 75, pp. 6-11. This is another distraction. The standard is not whether the warrant applications furnished probable cause that Mr. Young was a "dangerous man," *Millender v. County of Los Angeles*, 620 F.3d 1016, 1029 (9th Cir. 2010) *rev'd on other grounds*, *Messerschmidt v. Millender*, 565 U.S. 535 (2012), but whether *all* his firearms and related materials were evidence of a specific charged

2

crime. They were not, they are not. All the potential "crimes" cited by the government are in fact protected speech. And the government's pictures of body armor attached to the opposition – a kind of trailer for its trial strategy – do not change this.

Third, the government contends it is premature to suppress the irrelevant Nazi paraphernalia and related items, seized outside the scope of the warrants. ECF 75, pp. 21-22. "After all," the government observes, "there is little point in litigating over whether the seizure of a particular item was within the scope of the warrant if the item is not going to be presented at trial anyway." *Id.* Mr. Young could not agree more: that's why undersigned counsel served a Fed. R. Crim. P. 12(b)(4)(B) demand on the government, requesting its specific evidence for trial so that a timely motion to suppress could fix on a stationary target. The government did not respond to that letter – or to several follow-up requests for the same information. Later, in a phone conversation, counsel for the government advised the defense to "assume" that all items and objects seized from Mr. Young's home would be used at trial. ECF 69, p. 7 (citing Smith Decl., ¶ 2.). At all events, if an object is seized outside the scope of a warrant, it must be immediately returned regardless of whether the government ultimately chooses not to use it at trial.

Finally, the government asserts that even if the warrants were invalid the motion should be denied because the investigators conducting the searches relied in good faith on facially valid warrants. ECF 75, pp. 19-21. It cites four exceptions to the good-faith rule, which it argues do not apply. *Id.* The government missed one. Where the law enforcement agent who applied for a warrant is also the agent who executed it, the "good faith exception" to an invalid warrant does not apply. That is true for all the searches under consideration, and imputes to all searching agents under the collective knowledge doctrine in the Fourth Circuit. Further, a warrant

3

predicated on a false representation, as described in *Franks v. Delaware*, is not subject to the good faith exception. Here, the warrant affidavits represented that Mr. Young had "contacts with terrorist groups in the past" and attempted to "travel overseas to fight on behalf of terrorist groups." ECF 69-3, p. 3. These statements are false, and could well be recklessly so.

### A. The Court Should Strike or Disregard the Untimely Opposition Papers Pursuant to Fed. R. Crim. P. 45

Under Local Criminal Rule 12(A), a response to any motion shall be filed within eleven days after the filing of the motion. Rule 45 of the Federal Rules of Criminal Procedure provides:

(b) EXTENDING TIME.

> (1) *In General*. When an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made:
>
> (A) before the originally prescribed or previously extended time expires; or
>
> (B) after the time expires *if the party failed to act because of excusable neglect*.

Fed. R. Crim. P. 45 (b) (emphasis added).[1]

The government's response to Mr. Young's motion was due by February 28, 2017. On February 28, undersigned counsel emailed the government and inquired when it would respond to the motion, noting that Mr. Young needed to notice a hearing date. The government never responded. The government's opposition brief was filed about one minute before midnight on March 4, 2017. ECF 75. The government did not offer any explanation for the delay, nor move for an extension based on excusable neglect. The opposition should therefore be stricken or disregarded. *See*, *e.g.*, *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir.

---

[1] Rule 45 governs "comput[ation] [of] any time period specified in these rules, in any local rule or court order…." Fed. R. Crim. P. 45.

4

1996) ("The most important [] factor[] . . . . for determining whether 'neglect' is 'excusable' is the reason for the [delay].").

B.   **The Search Warrant Applications Did Not Establish Probable Cause of Any Crime Beyond the Gift Card Charge – and a *Franks v. Delaware* Hearing Should be Held**

The government's opposition defends the overbroad seizure categories in the search warrant applications – unbound by date restrictions – by purporting to identify in them probable cause of crimes beyond the gift-card charge. ECF 75, pp. 5-11. This post-hoc justification fails – all the newly cited "crimes" constitute speech protected by the First Amendment – and moreover raises questions that should be addressed in a *Franks v. Delaware* hearing.

First, the government asserts that the seizure categories might have been overbroad given that the complaint (not the indictment) apparently attempted to charge Mr. Young with criminal conduct that occurred from "October **2014** through July 28, 2016 [the date when the gift cards were allegedly sent]." ECF 75, p. 5 (emphasis original). Specifically, the government cites "Young's provision of advice to help CHS join ISIS as early as *August 2014*." *Id.* (emphasis original). This argument fails for a simple reason: the government did not indict Mr. Young on this "advice" theory, ECF 38, p. 2, because that charge would have been legally deficient, because it was inconsistent with the First Amendment, because probable cause of the crime was lacking, or all the above. In any case, the government offers no explanation for what nonredundant evidence of this "crime" would be found in Mr. Young's residence, backpack, pickup truck and locker, particularly given that, like the gift-card charge, it would have been induced by the government itself.[2]

---

[2] *See* How an American Ended Up Accused of Aiding ISIS with Gift Cards, NEW YORK TIMES, Jan. 28, 2017, available at http://nyti.ms/2jhri7A ("Some F.B.I. officials pressed to bring criminal charges against Mr. Young years ago, but the Justice Department rebuffed them because of an apparent lack of evidence that he was involved in supporting terrorism, according to law enforcement officials.").

5

Next, the government purports to identify probable cause of additional, non-gift-card crimes in Mr. Young's "travel to Libya in 2011" and in "his involvement with the Abu Salim Martyr's Brigade," a "militia group that has possible links to al-Qaeda, a designated [FTO]." ECF 75, pp. 6, 9.  This argument fails for several reasons.  In the first place, although it may now constitute a crime to travel *from* Libya to the U.S., it was not a crime for Mr. Young to travel *to* Libya in 2011.  Secondly, when Mr. Young traveled to Libya in May 2011, he did not meet or associate with anyone in something called the "Abu Salim Martyr's Brigade."[3]  Thirdly, the criminal statute cited in the search warrant affidavits concerns material support *for an FTO* – and the government does not even claim in opposition that the "Abu Salim Martyr's Brigade" *is* an FTO.  It merely suggests this alleged "militia group" "*possibl[y]*" has "links" to as-Qaeda, which is an FTO.  ECF 75, p. 9.  But "possible" cause, is not probable cause.  *See*, *e.g.*, *Illinois v.* Gates, 462 U.S. 213, 238 (1983) (probable cause is a "fair probability").  And perhaps this innuendo is merely "possible" – and not "probable" – for understandable reasons.  The U.S. government itself supported various "militia groups" in the 2011 Libyan Civil War.  It is one thing when one man's terrorist is another man's freedom fighter.  It's something else entirely when it's terrorist and freedom fighter to the same man.  *See* U.S.-Approved Arms for Libya Rebels Fell into Jihadis' Hands, NEW YORK TIMES, Dec. 5, 2012, available at http://nyti.ms/1Nm2sGt.  Lastly,

---

[3] Mr. Young will likely testify at trial on this point, but with the Court's leave, he would submit an affidavit for purposes of this motion attesting to this fact.  In opposition, the government cites an "electronic communication between February and July 2015" that purports to summarize a communication in which Mr. Young asked the CHS to notify him if the CHS should encounter "any of the mujahideen that Young served with in Libya in the [Abu Salim Martyr's Brigade]." ECF 75, p. 8.  This is a mischaracterization of Mr. Young's experience. At the time he visited Libya, he never met anyone who claimed to be involved in or with this group. Upon his return to the U.S., he learned through public research that Libyans from the region where he had traveled had formed a group with this name in opposition to ex-Prime Minister Muammar Gaddafi in the 2011 Libyan Civil War, in which the U.S. government and allied forces supported rebels against the Gaddafi regime.  Mr. Young never determined whether any Libyans he had encountered were the same as those who made up the "Abu Salim Martyr's Brigade" after he had departed the country.

the government has now represented to two magistrate judges and to this Court that there is probable cause to support Mr. Young's association with/support for a real world FTO (*i.e.*, (1) Mr. Young's "connection" to the Abu Salim Martyr's Brigade; and (2) that group's "link" to al-Qaeda). That allegation is false. The Court should hold a *Franks v. Delaware* hearing where the government will reveal the alleged facts supporting this serious but unindicted allegation. *See*, *e.g.*, *Miller v. Prince George's County*, 475 F. 3d 621, 627-28 (4th Cir. 2007) (*Franks* hearings determine whether (1) false statements in warrant application were made with reckless disregard for the truth; and if so, (2) whether the false statement was "material," *i.e.*, necessary to the magistrate judge's finding of probable cause). If there is no factual predicate at all, all warrant applications making this false representation – and warrants predicated on them – may well be rendered invalid. *Id.*

The government also cites certain protected-speech comments which it says constituted probable cause that Mr. Young "*may have been* planning or engaged in other terrorist activity between 2011 and 2016" (i.e., other than the gift cards given to a "friend"). ECF 75, p. 9. For many reasons, these arguments fail. To begin with, "*may have*" – just like "*possibly*" – is a modality plainly insufficient for a probable cause determination. More fundamentally, the cited actions/comments do not in themselves constitute crimes for which probable cause could be said to exist. Some five years before the warrant applications were filed, Mr. Young is alleged to have commented that he "despised the FBI"; that the FBI and courthouse were vulnerable to attack (by anyone but not necessarily by Mr. Young); discussed marksmanship with one Amine El-Khalifi[4]; owned some guns (he has been shooting guns since childhood when he used to shoot

---

[4] Again, Mr. Young will likely testify on this point at trial, but with the Court's leave he would be willing to submit at affidavit for purposes of this motion showing one of the many reasons why the government's El-Khalifi-related allegations are remarkable. Not only was Mr. Young barely an acquaintance of the

7

with his grandfather and sister); "asked CW [a confidential witness] about the chemical components of gun powder"[5]; owned some body armor[6]; "collected Nazi memorabilia"; and "dressed up for a Halloween party as Jihadi John."[7] ECF 75, pp. 6-10.

Set to the side the fact that the government's own undercover agent expressed skepticism that Mr. Young was even sincere in making some of his comments. ECF 2, p. 5. As the government and the Court well know, none of these remarks– no matter how misguided and disreputable (and Mr. Young is the first to acknowledge they were terribly stupid stabs at dark comedy and sincerely regrets them) – could constitute criminal charges that withstand First Amendment scrutiny. *See*, *e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (First Amendment includes the freedom to advocate the use of force or the violation of the law or even to advocate for unlawful action at some indefinite time in the future); *Snyder v. Phelps*, 562 U.S. 443 (2011) (First Amendment shields unsavory picketers at military funeral).

---

convict in question, in another manifestation of the entrapment present in this investigation it was the government's own undercover agent who introduced Mr. Young to El-Khalifi.

[5] As Mr. Young previously explained, contrary to the representations in the search warrant application for his home, the CW had not "been at Young's residence on many occasions," (Smith Decl., Exh 1.), and *initiated* the conversation about gun powder. ECF 69, p. 4 n. 1. Furthermore, the investigating agents likely knew this CW bore a personal grudge against Mr. Young. *Id.* It may be for that reason that the warrant application contains no representation as to the reliability of the CW's statements concerning gun powder.

[6] The government speculates that the multiple "sets" of body armor were "sufficient to arm numerous confederates" – possibly in a hypothetical attack of some sort. The truth, as Mr. Young will testify and is willing to put in an affidavit for this motion, is more prosaic. He bought and sold body armor – some of which is nylon-based and not even sufficient to stop a bullet – because prices were rising on them and he could return a profit on resale. His eBay market history, which the government already possesses, will show that in multiple instances he purchased and sold identical copies of the same item, not just body armor, and not just military equipment.

[7] The Jihadi John costume allegation is among the strangest in this case. The government omits to mention the theme of the Halloween party in which the costume was worn: Super villains. It is actually the government's contention that proof of the defendant's allegiance to ISIS lies in his decision to don the outfit of the group at a super villains costume party.

Shorn of the inflammatory (but protected) speech and innuendo, then, the government has not identified a single actionable crime beyond the gift-card charge to support the sweeping seizure categories in the search warrant applications.

C. **The Search Warrant Applications Failed to Link the Firearms, Ammunition, Body Armor and Related Materials to Be Seized to Any Crime**

Because the government fails to identify in the search warrant applications probable cause of any specific, actionable crime beyond the gift-card charge, the warrants necessarily failed to identify the firearms, ammunition, body armor, and related materials to be seized "by their relation to designated crimes." *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010). The Fourth Amendment particularity requirement is therefore not satisfied with respect to those items. *Id.* (Even the government does not appear to argue that it could have seized these items without regard to any specific crime for which probable cause was provided.)

Thus, contrary to the government's analysis, *Millender* is directly in point. ECF 75, p. 11. Just as in *Millender*, the "any and all firearms" warrant formulation in this case was unmoored from any specific, cognizable crime alleged in the warrant applications. *Millender*, 620 F.3d at 1025-29620 F.3d at 1025-29.

The government takes one stab at linking the specific seized firearms to representations in the search warrant affidavits. But even if the Court were to identify in the affidavits crimes beyond the gift-card charge to which the firearms and related materials could be linked – which it should not do, as all the "crimes" are protected speech – the government has failed to show such a connection. It represents that "Young himself told the UCO that *his various weapons* [i.e., the seized firearms] *could be* used to (a) attack an FBI building; (b) kidnap an FBI agent; (c) smuggle guns into the courthouse; (d) fight any attempts to search his house." ECF 75, p. 11 (citing ECF 2 at ¶¶ 11, 12, 15, 19) (emphasis added). But, as the Court will see for itself,

9

contrary to the government's representation in its opposition, Mr. Young does not refer to *his firearms at all* in the first three of those alleged instances of protected speech (*i.e.*, ECF 2 at ¶¶ 11, 12, 15). Moreover, the fact that a firearm "could be used" to commit a crime, does not supply probable cause that the firearm *is* evidence of a crime. This is yet another backdoor attempt at criminalizing protected speech.

The government cites two cases in opposition. Neither supports its position. The government cites *Mora v. Cty. of Gaithersburg*, 519 F.3d 216, 227-28 (4th Cir. 2008), implying this case endorses the warrant formulation of seizure of "any and all firearms." ECF 75, p. 11. It does not. In *Mora*, the Fourth Circuit merely found reasonable law enforcement's warrantless search of the home of a suicidal man who had just been apprehended at gunpoint after confiding to a healthcare hotline operator, minutes before the search, that he had guns in his home and could see himself "shooting people at work." 519 F.3d at 220. In those exigent circumstances, the Fourth Circuit held that a "public safety rationale" rendered reasonable the immediate seizure of all the man's firearms in the home. *Id.* at 227-28. Those are not the facts here, and the government does not even argue a "public safety rationale." Mr. Young was at work, not at home, when he was arrested, and his arrest occurred before the search of his residence – to say nothing of the fact that the government declined to arrest Mr. Young while he remained a gun-carrying officer with the D.C. Metro Transit police over the course of years of investigation. *Cf Millender*, 620 F.3d at 1029 ("[T]here is no 'dangerousness' exception to the Fourth Amendment's probable cause requirement, regardless of whether a search involves violent suspects or deadly weapons. A police officer's valid safety concerns do not create a 'fair probability' that a broad class of weapons may be found in a suspect's residence or that such items are contraband or evidence of a crime.").

The other case, *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), is inapposite for different reasons. There, the affidavit in support of a warrant to search a trailer home alleged that the "evidence seized would prove that [the defendant] possessed *illegal firearms* while being an unlawful user of controlled substances." 275 F.3d at 502 (emphasis added). It also particularly tied the firearms and explosive devices to be seized to "one or more conspiracies to construct and use explosive devices to destroy interstate highways and various federal buildings; and to kill federal agents, police officers, federal judges, federal informants and their family members." *Id.* Several sources, including informants and confidential witnesses, linked the defendant to these concrete conspiracies set out in detail in the affidavits. *Id.*

Unlike in *Graham*, the government's warrant affidavits here did not allege that any of the firearms or body armor owned by Mr. Young were illegally obtained or possessed. Unlike in *Graham*, the warrant affidavits here did not allege any specific *conspiracies or other inchoate offenses* to attack or harm anyone or anything with the firearms, body armor (traded by Mr. Young on eBay) or other related items in Mr. Young's home.

### D. The Search Warrant Applications Did Not Furnish Probable Cause to Seize Entire Categories of "All Documents and Records" and All Electronic Devices

The government strains to defend the warrants' overbroad authorization to seize *all* documents and records pertaining to travel, international transfers of money, *any* account with *any* service provider, contact lists, and *all* electronic devices – unfettered by any date restriction – by again citing "other crimes," beyond the gift-card crime, that might be identified in the search warrant applications. ECF 75, pp. 12-17. As explained above, they are nowhere to be found.

The government again cites Mr. Young's alleged but unindicted and legally unactionable "advice" to the CHS in 2014; the "likely" material support to "an affiliate of al-Qaeda as early as

11

April 2011"; as well as "other attempts" to support "terrorists" "between 2011 and 2016." ECF 75, p. 12. Indeed, at one point, the opposition represents that "the affidavits allege that the defendant maintained his support for terrorist organizations *over a period of at least five years*." ECF 75, p. 15 (emphasis added). These contentions are unsubstantiated, strikingly so in light of their gravity. As discussed above, there is no material-support-for-terrorism charge in this case concerning "advice"; there is only a gift-card charge. What is characterized as a "possible" link between the Abu Salim Martyr's Brigade (which Mr. Young had no connection to) and FTO al-Qaeda on page 9 of the opposition, is somehow upgraded to a "likely" connection by page 12. Then, on page 13, the government flatly states that Mr. Young's trip to Libya *was* (to a certainty) "in violation of § 2339B" (though he was never indicted for it). ECF 75, p. 13. As for the "other attempts" to support "terrorists" "between 2011 and 2016"… -- these are not enumerated.

The government asserts that the "international transfers of money" seizure category might be justified because these documents and records are "likely to be relevant to . . . . assets that he sought to send overseas in 2015." ECF 75, p. 12. But the government does not explain how seeking to send assets overseas is a crime. Nor do the search warrant affidavits.

As for the categories of "any and all records, documents . . . . that concern any accounts with any service provider," the government observes blandly that Mr. Young used email in communicating with the CHS. ECF 75, p. 13. This, according to the government, is supposed to render particularized a warrant for *all* records concerning *any* service provider on *any* subject, unbound by *any* date restriction. The government cites no legal support for its position.

As regards "all contact lists . . . . of individuals associated with Nicholas Young," the government alleges that Mr. Young once asked the CHS to notify him if the CHS encountered any of the "mujahideen that Young served with in Libya." ECF 75, p. 14. But this one alleged

12

communication with the CHS cannot provide probable cause to search for all contacts lists having nothing whatever to do with the facts of this case or even with terrorism generally. The government cites no authority to the contrary.

The government attempts to excuse the lack of any temporal limitations in the warrant applications by claiming that "when the government does not know the specific dates of the defendant's illegal conduct or where illegality 'permeated' the defendant's conduct," it need not provide such temporal limitations. ECF 75, p. 14. Quite so. Except that the government alleges in this case that it *did* know when the illegal conduct occurred – July 28, 2016, the date when the gift cards were allegedly sent. ECF 2, p. 16. And although Mr. Young's trip to Libya was in no way illegal, assuming arguendo it was illegal, the government knows when that took place, too. ECF 2, p. 6. As for the argument that "illegality permeated" Mr. Young's conduct, as discussed above, there is no factual support for the contention that the affidavits provided probable cause to show that he "maintained his support for terrorist organizations over a period of at least five years." ECF 75, p. 15. To the extent the warrant applications actually make such a representation, the government should offer its factual predicate at the *Franks v. Delaware* hearing.

As for the seizure category of "all cellular phones, smart phones, electronic data processing and storage devices, computers and computer systems, keyboards, and other associated peripherals, Central Processing Units, external and/or internal drives, portable drives . . . .," the government offers two arguments to defend the warrants from an overbreadth challenge. First, it contends that this category is not overly broad because the warrants permit it to search these devices "only for the items listed above [i.e., from other seizure categories]." ECF 75, p. 16. This defense fails because, as explained above, the other seizure categories are

themselves overly broad.  Second, the government contends the affidavits contained "ample probable cause" to seize all of these devices – even apart from their stored content.  *Id.*, p. 16.  It is not wholly clear what the government's argument means, but in support of its position it cites the allegations that Mr. Young "used burner phones"; was "sophisticated about computer matters"; used a PlayStation 4 gaming system; and "discussed his ability to use tablets." *Id.*  It is not apparent how these banal facts would yield probable cause of a crime of which every electronic device a defendant owns would constitute evidence, and the government cites no support for this proposition.

### E.  The Unduly Prejudicial and Irrelevant Objects Seized Outside the Scope of the Warrants Should Be Suppressed and Returned Now

The government seized, *inter alia*, Nazi paraphernalia and a Confederate flag from Mr. Young's home.  Although the government does not even attempt to argue the warrants authorized such seizures (they plainly do not), it contends "there is little point in litigating over whether the seizure of a particular item was within the scope of the warrant if the item is not going to be presented at trial anyway." ECF 75, p. 21.  This argument fails for multiple reasons.

First, the issue is being litigated now because, after undersigned counsel made several unavailing attempts to elicit the government's intended evidence for trial pursuant to a Fed. R. Crim. P. 12(b)(4)(B) demand so that a suppression motion could be promptly filed, the government expressly represented to defense counsel that these irrelevant materials would be used at trial, along with every other object seized from Mr. Young's home.  ECF 69, p. 7 (citing Smith Decl., ¶ 2.).  (The government has also sent more than one email to undersigned counsel with Nazi-related images attached to them – certainly suggesting it will attempt to use them at trial.) The point of addressing the issue now is that a suppression motion must be filed now under the federal and local rules, not at some uncertain date in the future "once the government has

14

identified the exhibits it plans to present at trial" (more than seven months after the defendant was arrested).

Second, if an object is seized outside the scope of a warrant, it must be immediately returned regardless of whether the government ultimately chooses not to use it at trial – because the object is private property that doesn't belong to the government, isn't evidence of a crime, and should be returned. *Williams*, 592 F.3d at 520 (if documents or objects not covered by the warrant are improperly seized, "the government should promptly return [them] or the trial judge should suppress them").

Because the government has presented no argument on the merits with respect to the Nazi paraphernalia and related materials (ECF 69, p. 6 & n.2), they should all be suppressed.[8]

### F.     The "Good Faith Exception" to An Invalid Warrant Does Not Apply Here

The government argues that, even if the search and seizure warrants are overbroad, unparticularized, and therefore invalid, the "good faith exception" should apply, and thus the fruits of the searches should not be suppressed. ECF 75, pp. 19-21. But, for two reasons, that exception does not apply in this case.

As the government observes, the purpose of the exclusionary rule is to incentivize proper conduct on the part of law enforcement; evidence should be suppressed where exclusion "can meaningfully deter . . . . deliberate, reckless, or grossly negligent [constitutional violations], or in

---

[8] The government appears to suggest that the "plain view" doctrine might somehow permit the investigating agents to seize these items even if they were outside the scope of the warrants. ECF 75, p. 22. But in order for agents to seize an item outside the warrant in plain view, *inter alia*, the "incriminating character of the items must be immediately apparent." *United States v. Davis*, 690 F.3d 226, 237 (4th Cir. 2012). The Nazi paraphernalia and related items are not "incriminating" in a material-support-for-terrorism case involving gift cards given to an undercover informant, and certainly not in an "immediately apparent" way. In any case, the government has not even attempted, at any point, to craft an argument in support of that position.

some circumstances recurring or systemic negligence." ECF 75, p. 20 (*quoting Herring v. United States*, 129 S. Ct. 695, 702 (2009).

Accordingly, one circumstance where the good-faith exception does *not* apply is where the law enforcement agent who is the affiant for the invalid warrant is also the agent who executed the warrant. *See Groh v. Ramirez*, 540 U.S. 551, 564 (2004). In *Groh*, the Supreme Court considered whether a search warrant affidavit was sufficiently particularized, and if not, whether the investigating agent possessed qualified immunity for the constitutional violation. First the Court determined that the warrant was grossly unparticularized in its list of items to be seized, among other reasons because the error was not "a mere technical mistake or typographical error." 540 U.S. at 558. The Court then turned to whether the agent could have "reasonably relied" on the unparticularized warrant to conduct a search. 540 U.S. at 563-64. The Court found he could not have. That was because the agent "himself prepared the invalid warrant, [so] he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid." *Id.* at 564. *See also United States v. Herrera*, 444 F.3d 1238, 1250-1251 (10th Cir. 2006) ("[B]ecause the purpose underlying the good-faith exception is to deter *police* misconduct, logically *Leon*'s exception most frequently applies where the mistake was made by someone other than the officer executing the search that violated the Fourth Amendment. The Supreme Court has never extended *Leon*'s good-faith exception beyond the circumstance where an officer has relied in good faith on a mistake made by someone other than the police."); *Millender*, 620 F.3d at 1035 ("Nor is this a case where the warrant was defective because the *Magistrate* made an error.") (emphasis added); 1 LaFave, *Search and Seizure* § 1.3(f) (noting that *Leon* "does not allow law enforcement authorities to rely on an error of their own making") (quotation omitted);

16

2 LaFave, *Search and Seizure* § 3.5(d) (noting "the *Evans* rationale would seem inapplicable whenever the mistake was instead attributable to the law enforcement agency").

Here, all the FBI affiants for the search warrants also executed the warrants personally. Specifically, as the government's opposition acknowledges, Special Agent David Martinez was the affiant for the residence search warrant affidavit. ECF 75, p. 2. S.A. Martinez personally executed the warrant at Mr. Young's home.[9] Similarly, S.A. Nicholas Caslen was the affiant for the warrant affidavits for Mr. Young's backpack, pickup truck, and workplace locker. ECF 75, p. 3. He also executed the warrants for those places and things. Because these agents both sought the invalid warrants and executed them, they could not have "reasonably relied" on them and the good-faith exception does not apply. *Groh*, 540 U.S. at 563-64; *Herrera*, 444 F.3d at 1250-1251. Furthermore, under the "collective knowledge doctrine" the affiant-agents' knowledge of the invalid warrants was imputed to the other investigating agents. *See*, *e.g.*, *United States v. Blauvelt*, 638 F.3d 281, 289-90 (4th Cir. 2011) ("The collective knowledge doctrine applies when at least some, but not all, of an investigative team has actual knowledge of facts necessary to a finding of probable cause….The knowledge is imputed from one officer to another such that the officers collectively are assumed to have actual knowledge of the imputed fact.").

Another circumstance where the good-faith exception does not apply occurs when a false statement in the warrant application showed a reckless disregard for the truth, *i.e.*, a violation of *Franks v. Delaware*. *United States v. Leon*, 468 U.S. 897, 923 (1984). Here, as discussed above, the search warrant affidavits contained at least two false representations, that Mr. Young: had

---

[9] FBI-302s produced in discovery state which Special Agents executed the warrants. These documents are not marked "SENSITIVE DISCOVERY MATERIALS" pursuant to the Protective Order entered on September 23, 2016, ECF 25, but out of an abundance of caution, Mr. Young does not attach them to this reply. If the Court would like to see these documents, Mr. Young will file them under seal at his earliest convenience.

"contacts with terrorist groups in the past" and attempted to "travel overseas to fight on behalf of terrorist groups." ECF 69-3, p. 3.  The opposition indicates these statements were predicated on an alleged link between the Abu Salim Martyr's Brigade and the FTO al-Qaeda, which the government has variously described as "possible," "likely" or certain.  The very inconsistency of these representations certainly suggests reckless disregard.

For all of the foregoing reasons, the following items seized from Mr. Young's residence, backpack, truck, and workplace locker should be suppressed: (1) documents and records pertaining to travel, international transfer of money, any account with any service provider, contact lists, and all electronic devices; (2) all firearms, ammunition, body armor, and military-style equipment; and (3) items seized outside the scope of the warrants, including Nazi paraphernalia and the Confederate flag.

Dated: March 6, 2017

                                        **DAVID B. SMITH, PLLC**

                                        */s/ David B. Smith*
                                        David B. Smith (VA Bar No. 25930)
                                        108 N. Alfred St.
                                        Alexandria, VA 22314
                                        Phone:(703)548-8911
                                        Fax:(703)548-8935
                                        dbs@davidbsmithpllc.com

                                        */s/ Nicholas D. Smith*
                                        Nicholas D. Smith (admitted *pro hac vice*)
                                        7 East 20th Street
                                        New York, NY 10003
                                        Phone: (917) 722-1096
                                        nds@davidbsmithpllc.com

**Certificate of Service**

I hereby certify that on the 6th day of March, 2017, I electronically filed the foregoing reply with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

    AUSA Gordon D. Kromberg
    U.S. Attorney's Office
    2100 Jamieson Avenue
    Alexandria, Virginia 22314
    gordon.kromberg@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

    */s/ David B. Smith*
    David B. Smith
    VA Bar No. 25930
    David B. Smith, PLLC
    108 North Alfred Street
    Alexandria, Virginia 22314
    (703) 548-8911 / Fax (703) 548-8935
    dbs@davidbsmithpllc.com