IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16-cr-265 |
| | ) | |
| NICHOLAS YOUNG | ) | |

<u>Government's Opposition to Motion to Exclude Expert Testimony</u>

Nicholas Young moves the Court to exclude at trial expert testimony by Dr. Daveed Gartenstein-Ross and Arlington County Police Corporal Ian Campbell. The motion is based on a misunderstanding of the applicable law, and should be denied.

Federal Rule of Evidence Rule 702 provides that expert testimony is appropriate when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The rule further provides that a witness qualified as an expert may be permitted to testify where "[1] the testimony is based upon sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). These requirements have been distilled into two crucial inquiries: relevancy and reliability. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 141, 149 (1999). Dr. Gartenstein-Ross's testimony meets both requirements.

The factors relied upon to test reliability must be "tied to the facts of the particular case." *Id.* at 150. The "test of reliability is flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* The trial court has "broad latitude" to determine which specific factors are or are not appropriate indicia of reliability in a given case. *Id*. at 153.

A "trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *United States v. Wilson*, 484 F.3d 267, 273 (4th Cir. 2007). "But at bottom, the court's evaluation is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). "In sum, Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." *Kumho Tire,* 526 U.S. at 158.

I. Daveed Gartenstein-Ross

Dr. Daveed Gartenstein-Ross is a prolific scholar, author, lecturer, and public intellectual. The list of his books, monographs, articles, and speeches is lengthy.[1]  Young cannot credibly contest that Dr. Gartenstein-Ross is an accomplished academic, researcher, lecturer, and writer. He cannot credibly contest that Dr. Gartenstein-Ross was himself a Muslim who worked at an Islamic charity connected to Al Qaeda, or that Dr. Gartenstein-Ross is supremely well qualified to explain the cultural significance of individuals and items related to jihadist movements and Islamic terrorism. He cannot contest that Dr. Gartenstein-Ross was, in fact, earlier this year accepted in the United States District Court for the District of Columbia as an expert witness in

---

[1] The list of Dr. Gartenstein-Ross's books, monographs, articles, and speeches is included in the expert witness report previously filed on November 17, 2017. Dkt. 135-4. For ease of reference, pages 1-10 of that report, containing that list, are filed as Exhibit 1 to this pleading.

2

the evolution of the history of terrorist organizations and their claims of responsibility for acts of terrorism.[2]

Similarly, Young cannot credibly contest that Dr. Gartenstein-Ross has studied, taught, written, testified, and lectured about radicalization processes, including in the context of Neo-Nazis and white supremacists. Finally, he cannot credibly contest that Dr. Gartenstein-Ross is well qualified to explain the background and context of the civil war in Libya.

Instead, Young argues that Dr. Gartenstein-Ross's methodology is not scientific enough to pass muster under *Daubert*. That argument, however, has been repeatedly rejected when made in similar contexts. In short, motions to prevent the presentation of expert testimony to explain aspects of terrorism and radical Islam are uniformly rejected when they attempt to measure applied social sciences in the same way as physical sciences.

"The *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony . . . whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Thomas*, 490 Fed.Appx. 514, 520-21 (4th Cir. 2012).[3] *See United States v. Crisp*, 324 F. 3d 261, 266 (4th Cir. 2003) ("Rather than providing a definitive or exhaustive list, *Daubert* merely illustrates the types of factors that will bear on the inquiry"). "Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases.... In other cases,

---

2  Memorandum Opinion, *Foley v. Syrian Arab Republic*, Civ. No. 11-699 (D.D.C. April 13, 2017), at n.4. The relevant portions of that opinion are attached to this pleading as Exhibit 2.

[3]  Internal citations and quotations are omitted throughout this pleading.

3

the relevant reliability concerns may focus upon personal knowledge or experience." *Thomas*, 490 Fed.Appx. at 520-21.

The same arguments that Young makes now with respect to Dr. Gartenstein-Ross previously have been made with respect to terrorism experts such as Evan Kohlmann and Matthew Levitt. In essence, defendants have argued that the research conducted by counter-terrorism researchers such as Kohlmann, Levitt, and Gartenstein-Ross is not based on sufficient facts or data, and is not the product of reliable principles and methods. Time after time, however, this Court, the Fourth Circuit, and other courts have admitted their expert testimony despite such arguments, because such testimony is helpful to the trier of fact - - and as an application of social science, not subject to the type of tests that experts in "hard" sciences are.

For example, in 2004, in the (first) trial of Sabri Benkahla, this Court admitted the testimony of Evan Kohlmann as an expert on the recent history of Afghanistan and related terrorist groups. At the time, Kohlmann was a law student who, as an undergraduate, had written several papers on Afghanistan and the Taliban. Kohlmann engaged in extensive research on his own and in connection with a part-time job. Further, Kohlmann was about to publish a book, his first, on the war in Afghanistan. This Court admitted Kohlmann's expert testimony and found his testimony helpful.

The next year, Ali Al-Timimi moved to bar Kohlmann's expert testimony. Al-Timimi argued that Kohlmann's testimony should not be admitted because the government produced no information that would indicate that his opinions were tested, subject to peer review, whether there are known error rates applicable to his theory or technique, nor whether his technique

4

enjoys general acceptance within any scientific community. Al-Timimi's Motion in Limine Regarding Expert Witness Proffered by the United States, at p. 9.[4] In making this argument, Al-Timimi missed the same point in 2005 that Young does today: the tests he referenced were ill-suited to Kohlmann's field of expertise. *See Thomas,* 490 Fed.Appx. at 520 ("in considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally").

In response to Al-Timimi's argument, this Court stated:

> The last expert witness in the motion in limine is Mr. Kohlmann. Now, despite the defendant's arguments and despite Mr. Kohlmann's youth, this Court has watched him, I've heard him testify twice.[5] He is in my view qualified to testify as an expert on both the issue of the particular aspects of terrorism in the Middle East and with fundamentalist Islamic groups that he's been proffered for as well as the Internet and how these groups are communicating back and forth.

Transcript of Hearing, *United States v. Timimi*, Crim. No. 1:04cr385 (March 18, 2005), at p.26.[6]

The Court continued, explaining that Kohlmann's testimony would be important because it would help the jury understand the evidence being presented to it:

> [S]ome of that evidence first of all would be outside the ordinary understanding or information of the ordinary juror. I mean, the Court knows it because I've had the previous trial, and also I've done other cases, but Kohlmann may testify that -- he is definitely a useful expert in

---

4  Timimi's motion is attached to this pleading as Exhibit 3.

5  Kohlman previously had testified before this Court also in *United States v. Khan, et al.,* 309 F.Supp.2d 789, 812 (E.D. Va. 2004). In that case, Kohlmann testified regarding technical matters regarding the internet, as well as LET materials he had collected himself.

6  The relevant portion of the transcript of the hearing in which this Court ruled on Timimi's motion is attached to this pleading as Exhibit 4.

5

>    talking about those types of matters, that is, the nature of terrorist
>    operations, the need for training camps, and sort of the -- and that range of
>    information.

*Id.* at p. 28-29.

After this Court admitted Kohlmann's expert testimony at the first *Benkahla* trial, and did so again at the *Al-Timimi* trial, Judge Cacheris admitted Kohlmann's expert testimony at the second *Benkahla* trial. There, the defendant again argued that Kohlmann's testimony did not meet the *Daubert* standard because it was not the product of reliable principles and methods. Judge Cacheris denied the motion, and allowed Kohlmann's testimony on the grounds that it would be helpful to the jury.

Benkahla was convicted, and raised the admission of Kohlmann's expert testimony on appeal. In affirming the conviction, the Fourth Circuit approved the use of Kohlmann's testimony to ""assist the trier of fact to understand the evidence" and provide "background information on radical Islam and jihad generally rather than discussing Benkahla individually." *United States v. Benkahla*, 530 F.3d 300, 308 (4th Cir. 2008). In specific, the Fourth Circuit noted that "Benkahla also attacked Kohlmann's qualifications as an expert, but those qualifications were obviously substantial and the district court acted well within its discretion in determining that they were sufficient." *Id.* at 309, n.2.

In *Benkahla,* the Fourth Circuit wrote that Kohlmann's testimony could well be appropriate to enable the jury to understand the evidence, because the case "by necessity" touched "on a wide variety of ideas, terms, people and organizations connected to radical Islam." *Id*. at 309. "In these circumstances, the trial judge could well conclude that lengthy testimony

6

about various aspects of radical Islam was appropriate, and indeed necessary, for the jury "to understand the evidence" and "determine [the] fact[s]." *Id.* at 309-10. *See also United States v. Chandia*, 514 F.3d 365, n.3 (4th Cir. 2008) (Hilton, J.) (no error in denying *Daubert* hearing for Kohlmann's testimony as a terrorism expert).

In 2014, the Fourth Circuit again considered a challenge to Kohlmann's expert testimony. In *United States v. Hassan,* 742 F.3d 104, 131 (4th Cir. 2014), the Fourth Circuit ruled that admission of Kohlmann's expert testimony was proper, on the grounds that he possessed "the requisite knowledge, skill, experience, training, and education to testify on various aspects of the trend of decentralized terrorism and homegrown terrorism." Further, it held that "his testimony was "both reliable and relevant, thus satisfying Rule 702's requirements." *Id. Accord United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) (affirming admission of Kohlmann's expert testimony on the grounds that his work had undergone various forms of peer review; his opinions were generally accepted within the relevant community; and his methodology was similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations).

Earlier this year, a judge in the Eastern District of New York considered another *Daubert* challenge to Kohlmann's expert testimony. In *United States v. Hausa,* 12cr0134, the defendant moved to bar Kohlmann's expert testimony for failure to meet the standard for expert testimony under *Daubert*. *Order*, at 1.[7] Judge Brian M. Cogan rejected the challenge, and authorized Kohlmann to testify regarding the background and significance of terrorist organizations, as well

---

[7] A copy of the *Hausa* opinion is Exhibit 5 to this pleading.

7

as the common meaning and usage of words and concepts used by members of the global jihadist movement. *Id.* at 2. Judge Cogan wrote that Kohlmann's testimony "will help the jury to understand other evidence in the case. His testimony will place other testimony and documentary evidence in context, explain obscure terms and concepts and the role of specific al Qaeda leaders referenced by other Government witnesses and in defendant's prior statements, and enable the jury to better assess the significance of other evidence." *Id.*

Judge Cogan discussed Kohlmann's methodology, and wrote that Kohlmann demonstrated that he relied on sufficient facts and data in forming his opinions in this case:

> He has reviewed thousands of primary, secondary, and tertiary sources on al Qaeda and terrorism in general, which include open source documents as well as propaganda and other materials from what Mr. Kohlmann has identified as the 'deep and dark web,' and has continuing efforts to collect, analyze, and catalogue relevant terrorism and al Qaeda materials. Mr. Kohlmann further testified that other terrorism experts rely on similar facts and data in forming their opinions. Mr. Kohlmann has also relied on his prior training, education, and experience, including the several interviews he previously the several interviews he previously conducted of individuals affiliated with al Qaeda and other jihadist groups.

*Id.* at 3. In short, Kohlmann relied on facts and data in *Hausa* very similar to that which is relied upon by Dr. Gartenstein-Ross here.

Judge Cogan then considered a *Daubert* challenge similar to that brought by Young here. He specifically rejected the argument that Kohlmann's reliance on hearsay statements, testimonial statements, and terrorist propaganda violates defendant's Confrontation Clause rights:

> I reject defendant's argument that Mr. Kohlmann's reliance on hearsay statements, testimonial statements, and terrorist propaganda is improper and violates defendant's Confrontation Clause rights. At the *Daubert*

8

>hearing, Mr. Kohlmann testified that other terrorism experts rely on hearsay statements and similar forms of terrorist propaganda in forming their opinions, and thus Mr. Kohlmann's reliance on such materials is proper under Federal Rule of Evidence 703. *See United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) (holding that "expert witnesses can testify based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions."); *United States v. Daly*, 842 F.2d 1380, 1387-88 (2d Cir. 1988) ("[I]f experts in the field reasonably rely on hearsay in forming their opinions and drawing their inferences, the expert witness may properly testify to his opinions and inferences based upon such hearsay.").

*Id.* at 3. Just as Kohlman's reliance on hearsay statements and terrorist propaganda was proper, so is Dr. Gartenstein-Ross's.

Further, Judge Cogan agreed that the comparative analysis method of forming Kohlmann's opinions is a reliable methodology generally accepted in the field of international terrorism:

>The Government has established that in forming his opinions in this case, Mr. Kohlmann used and applied a reliable methodology, namely the comparative analysis method, which Mr. Kohlmann testified is generally accepted in the international terrorism field. At the hearing, Mr. Kohlmann explained his methodology, stating that he gathers multiple sources of information, including primary, secondary, and tertiary sources, analyzes whether a particular source has a perceived bias, and juxtaposes and cross-checks the various sources against one another to form a commonly accepted narrative. Mr. Kohlmann testified that he had used this methodology in forming conclusions in prior academic papers and articles, and that such papers and articles were subject to peer review and he did not receive negative comments as to the methodology used. Mr. Kohlmann also testified that he has used this methodology in forming opinions in prior cases where he testified as an expert. Indeed, Mr. Kohlmann's use of the comparative analysis method has previously been approved by the Second Circuit. *See United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011).

*Id.* at 4.

9

In *Hausa,* Judge Cogan then focused on the underlying issue: the defendant's challenge to Kohlmann's methodology was not so much a challenge to Kohlmann's qualifications in particular, as it was a challenge to the presentation of expert testimony in a qualitative social science field or historical research in general. *Id.* at 4-5. Judge Cogan reasoned, however, that he did "not see how a social scientist can form the kind of conclusions expressed in Mr. Kohlmann's report without reviewing primary, secondary, and tertiary sources, and then exercising judgment about which are corroborated or otherwise believed to be credible, and which should not be accepted." He concluded:

> That is what Mr. Kohlmann did. It seems to me no different than, for example, the exercise a historian would undertake to determine the precise location of the Battle of Hastings, or the troop size or unit strength of the combatants.

*Id*. at 5.

Kohlmann's methodology is similar to that used by Dr. Gartenstein-Ross. As Dr. Gartenstein-Ross explains in his report:

> My research and scholarship . . . is consistent with best academic practices. I mainly rely on primary-source information, including statements and social media postings by extremist groups and their supporters, and internal documents intercepted by the United States or other governments. I cross-check all primary sources I read against other primary-source information, against information about events on the ground in relevant theaters, and against relevant secondary-source literature that allows me to determine whether my conclusions are consistent with those of other scholars and practitioners. I also check my analytic track record against unfolding events to determine if my anticipatory analysis is accurate, or if it requires some recalibration.

10

Exhibit 1, at p. 10.  Inasmuch as Kohlmann's methodology is substantially the same as Dr. Gartenstein-Ross's, Young's challenge to the latter's methodology should be rejected just as was the challenge to Kohlmann's.

Evan Kohlmann is not the only terrorism expert whose methodology is similar to that of Dr. Gartenstein-Ross.  In *United States v. Damrah,* 412 F.3d 618 (6th Cir. 2005), the Sixth Circuit considered and rejected an argument similar to that which Young makes here.  In that case, the defendant sought to bar the expert testimony of Matthew Levitt about international terrorism generally and the Palestinian Islamic Jihad in specific.  Levitt was a fellow at a think tank in Washington, D.C., and pursuing a doctorate in international relations; he wrote articles and policy pieces, and testified before Congress.  In addition, he lectured at academic and policy conferences, and taught as an adjunct professor.  He conducted his research by relying on various sources, including newspapers, books, government documents, and court papers.  Order, *United States v. Damrah,* No. 1:03cr484 (N.D. Ohio June 9, 2004), at p. 10-12.[8]

Damrah argued that Levitt failed to rely on the type of underlying facts or data reasonably relied upon by experts in his particular field.  *Id.*  He further objected to Levitt's testimony on the grounds that "it relied heavily on inadmissible hearsay in violation of Federal Rule of Evidence 703 and that Levitt's testimony did not satisfy the requirements of Federal Rule of Evidence 702."  *Damrah,* 412 F.3d at 625.

---

[8] In short, Levitt's background was somewhat similar to that of Dr. Gartenstein-Ross. A copy of the *Damra* district court opinion is Exhibit 6 to this pleading.

11

Before trial, District Judge James S. Gwin rejected Damrah's *Daubert* argument, on the grounds that "Levitt's expertise is not scientific. He is a policy wonk, working in what is basically an applied social science. Therefore, many of the reliability factors listed in *Daubert* will likely not aid the Court in its reliability analysis." Exhibit 5, at p. 13. Judge Gwin noted that Levitt used the same methodology in his work for the FBI, and in connection with his testimony in Congress. "If his methodology is good enough for the other two branches of government, the Court sees no reason why it should not be good enough for the judiciary, too." *Id.* at 13-14. Indeed, Judge Gwin wrote that, although "Levitt's methodology appears to be little more than reading copiously, analyzing the data that he reads, and conveying that knowledge to others . . . *it seems to be very much the gold standard in the field of international terrorism.*" *Id.* (emphasis added).

On appeal, the Sixth Circuit affirmed Judge Gwin's conclusion. "Given the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon." *Damrah,* 412 F.3d at 625. Indeed, the Sixth Circuit quoted Judge Gwin's conclusion that Levitt's methodology was "the gold standard in the field of international terrorism." *Id.*[9]

The qualifications of Dr. Gartenstein-Ross obviously have to be considered separately from the qualifications of Evan Kohlmann and Matthew Levitt. Nevertheless, it is no slight to

---

[9] A challenge to Levitt's testimony as an expert witness was rejected in the Fourth Circuit as well. In *United States v. Hammoud*, the Fourth Circuit found that Levitt's testimony about the structure, leaders, and funding of Hizballah was "critical in helping the jury understand the issues before it." 381 F.3d 316, 337-38 (4th Cir. 2004), opinion reinstated in relevant part, 405 F.3d 1034 (4th Cir. 2005).

12

Kohlmann to point out that his qualifications at the time of the trials of Benkahla, Chandia, and Al-Timimi pale besides the qualifications of Dr. Gartenstein-Ross today. Indeed, it is no slight to Levitt to point out that, unlike Dr. Gartenstein-Ross today, Levitt did not possess a doctorate when he testified in *Damra.* Further, it is no slight to either Kohlmann or Levitt that - - unlike Dr. Gartenstein-Ross - - neither had ever converted to Islam, or worked at an Islamic charity connected to Al-Qaeda. That being said, Dr. Gartenstein-Ross's qualifications as an expert are manifest, and his methodology is reliable.

For Dr. Gartenstein-Ross, the relevance inquiry turns on Rule 702: his testimony has to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Benkahla*, 530 F.3d at 309. "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). In the *Benkhala* and *Timimi* cases, this Court saw Kohlmann's testimony to be reliable and helpful. There is every reason to expect the same of Dr. Gartenstein-Ross's testimony in this case.

As was the situation in the *Benkahla* and *Timimi* cases, the evidence in this case includes exhibits, messages, graphics, and conversations involving language, concepts, and clerics common to Islamic extremism; communications referencing jihads in Somalia, Syria, Iraq, and Libya; and videos and written materials possessed by the defendants and published by terrorist groups to promote Islamic extremism. It also includes similar materials common to Neo-Nazi extremism. Much of this evidence falls outside of a person's everyday experience.

13

The typical juror likely will be unfamiliar with the relevant ideas, terms (such as jihad, kafir, shaheed), people (such as Awlaki, Maqdisi, Zawahiri, Amin al Hussaini, William Pierce), organizations (such as Abu Salim Martyrs' Brigade, al-Shabaab, al-Qaeda in the Arabian Peninsula, the Frikorps, the Waffen SS, the National Alliance), theories, and other aspects of both radical Islam and Neo-Nazi extremism. It is unrealistic to expect that a typical juror could understand much of the evidence in this case without the assistance of expert testimony such as that provided by Dr. Gartenstein-Ross.

Dr. Gartenstein-Ross will not offer an opinion as to whether Young attempted to support ISIS in 2016, or that he ever was predisposed to do so. At no point in his testimony will he opine about the defendant as an individual, or as to his state of mind. Inasmuch as Dr. Gartenstein-Ross only will identify the individuals and explain the concepts depicted or referenced in Young's own communications and documents, his testimony properly should be admitted to help the jury understand an area that likely is foreign to them. His testimony will help the jury to understand the evidence in the case just as an expert witness is expected to do. "In such settings, the relevance of expert testimony is quite evident." *Hassan,* 742 F.3d at 131.

The conclusions previously reached with respect to the methodology used by Kohlmann and Levitt apply equally to that used by Dr. Gartenstein-Ross. Working in the field of applied social sciences, his methodology is equivalent to "the gold standard in the field of international terrorism." *Damrah,* 412 F.3d at 625.

II. Corporal Campbell

By letter of November 17, 2017, the government notified the defense that it would call as a witness Arlington County Police Corporal Ian Campbell. In that notification, the government stated that it believed Campbell to be a *fact* witness. The letter provided notice of his testimony as an expert, however - - "out of what may be an abundance of caution" - - because the defense might claim him to provide expert testimony.

In specific, the letter stated:

> As you know, when Corporal Campbell was in college with your client, they attended a rally of a Neo-Nazi group. I think that you also know that, in about 2010, your client gifted to Corporal Campbell the book *Serpent's Walk*. Not surprisingly, Corporal Campbell is expected to testify about those events. Accordingly, I believe that Corporal Campbell will be a fact witness. Nevertheless, when he talks about what he has learned about subjects such as William Pierce, the National Alliance, *Hunter*, the *Turner Diaries*, you might claim that he is providing expert testimony. *Out of what may be an abundance of caution*, I am, accordingly, notifying you pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and Federal Rules of Evidence 702 and 703, that Corporal Campbell may offer expert testimony. A copy of Officer Campbell's slide presentation that contains the gist of that portion of his testimony is included with this letter.

Discovery Letter #24 (emphasis added).[10]

As noted above, we believe that Corporal Campbell will testify as a fact witness. Regardless of whether he is an "expert" under Rule 702, he can testify about Neo-Nazis, *Hunter, Serpent's Walk,* and other indicators of extremism that he looks for in his capacity as a police officer. After all, he attended a Neo-Nazi gathering with the defendant and collected materials

---

[10] A copy of Discovery Letter #24 is Exhibit 7 to this pleading.

15

from the Neo-Nazi group when he was at that event. Moreover, ten years later, he received from the defendant a gift of a Neo-Nazi book.

Because we recognized that Corporal Campbell's testimony might be deemed to be "expert" testimony, we provided to the defense the slide presentation that Corporal Campbell uses when he presents training to other police officers.[11] As Corporal Campbell notes in the second slide of that exhibit, the information in his presentation was based solely on his own knowledge and research, and was intended to provide other officers with further information regarding the subject matter for which to conduct more thorough investigations.

As we explained to the defense in Discovery Letter #24, we expect Corporal Campbell to testify as a fact witness. To the extent, however, that his testimony is deemed "expert" testimony, then the defense has been provided with the equivalent of the "expert's" report.

## Conclusion

For the reasons stated above, the defendant's motion should be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     /s/
        Gordon D. Kromberg
        Assistant United States Attorney
        Virginia Bar No. 33676
        Attorney for the United States
        2100 Jamieson Avenue
        Alexandria, VA  22314
        (703) 299-3700
        (703) 837.8242 (fax)
        gordon.kromberg@usdoj.gov

---

[11] That presentation was included as Exhibit 1 to the defendant's motion to bar expert testimony.

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2017, I electronically filed the foregoing Opposition to Motion to Exclude Expert Testimony with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

/s/                                                        .
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

17